1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FLINN, an individual,<br><br>                              Plaintiff,<br><br>     v.<br><br>CEVA LOGISTICS U.S., INC., et al.,<br><br>                              Defendants. | CASE NO: 13-CV-2375 W (BLM)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION [DOC. 4]** |

Pending before the Court is Defendants CEVA Logistic U.S., Inc.'s, CEVA Freight, LLC's, and EGL Eagle Global Logistics, LP's (collectively "Defendants") motion to compel arbitration.  Plaintiff David Flinn opposes.

The Court decides the matter on the papers submitted and without oral argument.  See S.D. Cal. Civ. L. R. 7.1(d.1).  For the reasons discussed below, the Court **DENIES** Defendants' motion to compel arbitration [Doc. 4].

## I.      BACKGROUND

From 1998 until approximately August 2007, Plaintiff David Flinn worked as a pick-up and delivery driver for Defendant EGL Eagle Global Logistics, LP ("EGL").

(*Flinn Dec.* [Doc. 5-1], ¶ 2[1]; *Bateman Dec.* [Doc. 4-2], ¶ 5.)  Flinn worked exclusively out of EGL's San Diego depot facility.  (*Flinn Dec.*, ¶ 5.)  In order to apply for the job, Flinn completed an application, a drug test, and he signed a pre-printed truck lease and services contract.  (*Id.*, ¶ 3.)  Because Flinn had no prior experience as a delivery driver, EGL provided him with training.  (*Id.*)

In August 2007, EGL "combined" with TNT Logistics and eventually began operating as Defendant CEVA Freight, LLC ("CEVA").  (*Bateman Dec.*, ¶¶ 4, 6–8.) Flinn continued to transport freight for CEVA out of its San Diego Depot facility until he was terminated on October 10, 2012.  (*Flinn Dec.*, ¶¶ 5, 30.)

Flinn owned the truck used for deliveries, but CEVA maintained strict requirements regarding the appearance of his truck and maintenance.  (*Flinn Dec.*, ¶ 13.)  CEVA required a white truck that was kept clean and free of any damage, and was inspected on a routine basis by a mechanic.  (*Id.*)  Additionally, CEVA required Flinn's truck to display a large CEVA logo covering an area approximately 26 feet long, as well as other CEVA markings.  (*Id.*, ¶ 12.)  From 2005 until October 2012, Flinn's truck was generally left at EGL/CEVA's facility when not in service.  (*Id.*, ¶ 16.)  Flinn was also required to wear a CEVA uniform.  (*Id.*, ¶ 14.)

Flinn generally worked as a "floater" for CEVA, making pick-ups and deliveries in whatever geographic area assigned to him in a given day by the CEVA dispatcher. (*Flinn Dec.*, ¶ 15.)  CEVA instructed Flinn when to show up to receive his assignment from the dispatch office.  (*Id.*, ¶ 16.)  Throughout the day, CEVA dispatchers and others would contact Flinn about the status of assignments, and to provide him with any additional pick-ups.  (*Id.*, ¶ 20.)  Flinn generally returned to CEVA's depot at the end of the day to return any undelivered freight, and C.O.D. monies or freight he picked up.  (*Id.*, ¶ 24.)

---

[1] Defendants have filed objections to Flinn's Declaration. Defendants' objections to the portions of Flinn's Declaration cited in this order are overruled.  The Court need not decide the objections to the remaining portions of his declaration since those portions were not considered in ruling on the motion.

1    In approximately October 2010, Reed Peterson, Flinn's manager, gave him a 51-
2    page document entitled, CEVA Freight, LLC Agreement For Leased Equipment and
3    Independent Contractor Services (the "Agreement").[2]  (*Flinn Dec.*, ¶ 6.)  Peterson told
4    Flinn that he needed to sign the Agreement in order to continue working for CEVA.
5    (*Id.*)  Flinn asked Reed and others at CEVA questions about the Agreement, but was
6    told that they could not answer questions and there was no negotiating.  (*Id.*, ¶ 7.)
7    CEVA also refused to explain or discuss the document in any detail.  (*Id.*)

8    The Agreement also was sent to other San Diego drivers.  (*Flinn Dec.*, ¶ 8.)
9    While Flinn and the other drivers expressed concerns over certain payment provisions,
10   Flinn was unaware that the Agreement included an arbitration and choice-of-law
11   provision.  (*Id.*, ¶ 10.)  Nor did anyone from CEVA ever mention or alert Flinn to the
12   provision, which is located on page "20 of 51."  (*Id.*; *Agree.*, § 6.06.)

13   The arbitration and choice-of-law requirements are included in the same
14   provision entitled, Arbitration and Governing Law.  (*Agree.*, § 6.06)  The provision
15   provides that "any dispute arising out of or relating to this Agreement . . . or the legal
16   relationship between the parties, or of violations of the requirements of any applicable
17   . . . local, state, federal or foreign [law] . . . shall be submitted to final and binding
18   arbitration in accordance with (1) the Commercial Arbitration Rules . . . of the
19   American Arbitration Association . . . ."  (*Agree.*, § 6.06(c).)  The provision also
20   provides that Texas law governs "any disputes about the character and nature of the
21   legal relationship between the parties, and any and all other disputes between
22   Contractor and Company . . . ."  (*Id.*, § 6.06(a).)  In order to keep his job, Flinn signed
23   the Agreement on October 7, 2011.  (*Flinn Dec.*, ¶ 11; *see Agree.*)

24   Approximately a year after signing the Agreement, on October 10, 2012, Flinn
25   was terminated.  (*Flinn Dec.*, ¶ 30.)  Flinn then applied for unemployment benefits, and
26   his application was approved.  (*Id.*, ¶ 31.)

27
28
---
[2] The Agreement is attached to the Bateman Dec. as Exhibit A [Doc. 4-2].

1    In January 2013, CEVA appealed Flinn's award of unemployment benefits. (*Flinn*
2  *Dec.*, ¶ 32.)   After a hearing, the California Unemployment Insurance Board's
3  administrative law judge found Flinn was a CEVA employee and affirmed the award.
4  (*Id.*, ¶ 35, Ex. E.)  CEVA appealed again, and the Unemployment Insurance Appeal
5  Board affirmed the administrative law judge's ruling.  (*Id.*, ¶ 37, Ex. F.)

6    On October 3, 2013, Flinn filed this action alleging: (1) failure to pay wages,
7  including overtime and minimum wages, and failure to timely pay wages due; (2) failure
8  to provide itemized wage statements; (3) failure to provide meal and rest periods; (4)
9  intentional misclassification and unlawful deductions from wages; (5) failure to
10  reimburse employee expenses; (6) PAGA penalties for such violations; and (7) unfair
11  competition.  In response, CEVA filed the present motion to compel arbitration.[3]

12

13  **II.   DISCUSSION**

14    Flinn does not dispute that his claims fall within the scope of the arbitration
15  agreement.  Instead, Flinn contends that the agreement is unconscionable and thus not
16  enforceable.  However, before evaluating whether the agreement is unconscionable, the
17  Court first must resolve whether the Federal Arbitration Act applies.

18

19    **A.    The Federal Arbitration Act does not apply to agreements involving**
20        **workers engaged in interstate commerce.**

21    "'[A] contract evidencing a transaction involving commerce,' . . . is subject to"
22  the Federal Arbitration Act ("FAA").  Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207
23  F.3d 1126, 1130 (9th Cir. 2000) (quoting 9 U.S.C. § 2); see also Allied-Bruce Terminix
24  Companies, Inc. v. Dobson, 513 U.S. 265 (1995).   The FAA provides that any
25  arbitration agreement within its scope "shall be valid, irrevocable, and enforceable, save
26  upon such grounds as exist at law or in equity for the revocation of any contract."  9

27  ────────────────
28    [3] On July 14, 2014, Defendants have withdrawn their request to compel arbitration with respect to Flinn's PAGA representative action.  (*See Notice* [Doc. 9].)

U.S.C. § 2.  When a contract falls under the FAA, "[c]ourts must apply ordinary state law principles in determining whether to invalidate an agreement to arbitrate." Coleman v. Jenny Craig, Inc., 2012 WL 3140299 at *2 (S.D. Cal., 2012) (quoting Ferguson v. Countrywide Credit Indus., 298 F.3d 778, 782 (9th Cir.2002).) Thus, arbitration agreements may be invalidated by "contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." AT&T Mobility LLC v. Concepcion, 563 U.S. — , 131 S. Ct. 1740, 1746 (2011) (quoting Doctor's Assocs., Inc. v. Casarotte, 517 U.S. 681, 687 (1996)).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983).

The FAA also excludes certain contracts from its coverage.  Specifically, the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.  The party seeking to invoke this exemption bears the burden of establishing that it applies.  Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., 288 F.Supp.2d 1033 (D. Ariz. 2003).

Here, Flinn contends that the FAA does not apply because he is a worker engaged in interstate commerce. (Opp'n, 24:4-16.)  Defendants do not dispute that the Agreement "facilitates interstate commercial transactions," but instead dispute that Flinn was CEVA's employee.  (P&A [Doc. 4-1], 6:3-5; Reply [Doc. 6], 6:22–9:26.)

In support of his argument, Flinn relies on the Unemployment Insurance Appeals Board's finding that he was CEVA's employee.  Defendants counter that the ruling is inadmissible under California Unemployment Insurance Code § 1960 and that the Court must evaluate whether Flinn was an employee under California's control test. (Reply, 8:8–10, 16–18.)  The Court agrees with Defendants.[4]

_____

[4] Despite the Agreement's choice-of-law clause, Defendants do not contend that Texas law applies to the determination of whether Flinn was an employee for purposes of evaluating

Under California law, the "principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . ."  Arzate v. Bridge Terminal Transport, Inc., 192 Cal. App. 4th 419, 426 (2011).  "[W]hile the right to control work details 'is the most important or most significant consideration," California case law also use several "'secondary' indicia of the nature of a service relationship."  Id. (citation and internal quotations omitted).  Among secondary indicia are the following:

- the right to discharge at will and without cause is strong evidence of an employment relationship;
- whether the one performing services is engaged in a distinct occupation or business;
- the skill required in the particular occupation;
- whether the principal or worker supplies the instrumentalities, tools, and the place of work;
- the length of time for which the services are to be performed;
- the method of payment, whether by time or job;
- whether the work is part of the regular business of the principal; and
- whether or not the parties believe they are creating an employer-employee relationship.

Id.; Tieberg v. California Unemployment Ins. App. Bd., 2 Cal. 3d 943, 950 (1970).  In applying these factors, the evaluation of the nature of the relationship is "fact specific and qualitative rather than quantitative."  State Compensation Ins. Fund v. Brown, 32 Cal. App. 4th 188, 202 (1995).  Additionally, "[t]he label placed by the parties on their relationship is not dispositive[.]"  Id. at 425.

In Air Couriers International v. Employment Development Department, 150 Cal. App. 4th 923 (2007), a courier business filed a complaint to recover employee-related taxes paid for delivery drivers that the California Employment Development

---

if the FAA applies.  (See Reply, 8:14–9:26.)  Thus, the Court will apply California law. However, for the reasons set forth in section II.B.3. below, the Court also finds California law applies because the Agreement's choice-of-law provision is unenforceable.

1  Department contended were employees and not independent contractors.  The trial

2  court found that the drivers were employees and the company appealed.

3      The Court of Appeal first evaluated whether defendant exercised control over

4  the drivers.  As an initial matter, the court agreed that although drivers were able to

5  control the routes and speeds driven in making deliveries, the "simplicity of the work

6  (take this package from point A to point B) made detailed supervision, or control,

7  unnecessary[.]" Id. at 937.  The court then found that the evidence supported the trial

8  court's ruling that the company retained all necessary control over the overall delivery

9  operations.  Id.  Contrary to defendant's contention that the drivers controlled the

10  hours worked, evidence demonstrated that drivers worked regular schedules—which

11  the court stated was "consistent with employee status and reflect employer control"—,

12  and although allowed to turn down deliveries, drivers did so infrequently because of fear

13  of reprisal. Id. at 937–938.  The court also found the drivers' discretion in taking breaks

14  and vacations was not inconsistent with their status as employees. Id. at 937.

15      The Court of Appeal next evaluated secondary factors.  Again, the court found

16  the evidence supported the trial court's ruling that the drivers were "not engaged in a

17  separate profession or operating an independent business." Id. at 938.  The drivers were

18  not required to make a major investment in equipment or materials, but were required

19  only to have a vehicle and insurance.  Id.  Additionally, many of the drivers worked for

20  defendant "for years[,]" which the court found "inconsistent with independent

21  contractor status." Id.

22      Finally, the Court of Appeal agreed that the evidence supported the finding that

23  drivers were "performing an integral and entirely essential aspect of" the company's

24  business. Id. at 938.  Drivers were required to use the company's forms to be paid, were

25  paid on a regular schedule, notified dispatchers when deliveries were completed, and

26  dispatchers sent drivers to each delivery and provided deadlines.  Id.  Defendant also

27  encouraged drivers to wear the company's uniform, provided drivers badges and

28  placards for their vehicles, and the drivers delivered packages to the company's

- 7 -                                    13-cv-02375 W

customers, not their own.  Id.  Additionally, the company set the rates charged to customers, billed customers and collected payments.  Id.  As for the independent contractor agreements drivers signed, the Court of Appeal discounted its significance because the company often failed to enforce the agreements and failed to explain the legal and practical impact of the contracts.

Here, Flinn's declaration establishes that CEVA exercised greater control than the defendant in Air Couriers.  As an initial matter, this Court agrees with Air Couriers finding that the occupation at issue—a local delivery driver—does not require detailed supervision, or control.  Id. at 937.  Additionally, the evidence demonstrates that CEVA retained all necessary control over the overall delivery operations.  Flinn was told when to arrive at work at CEVA's depot.  (Flinn Dec., ¶ 16.)  Upon arrival, dispatchers gave Flinn a batch of assignments on a CEVA Delivery Manifest.  (Id., ¶¶ 15, 16.)  Flinn was required to review and sign the manifest in order to document the freight and delivery assignments.  (Id., ¶ 16.)  Although Flinn could theoretically refuse the assigned batch, just as in Air Couriers, he rarely refused the assignment out of fear of reprisal.  (Id., ¶¶ 17, 22, 23.)

CEVA also imposed delivery and pick-up restrictions, often instructed Flinn on how to handle freight, and the manner in which the freight was loaded onto Flinn's truck was dictated either by those restrictions or CEVA's dispatchers and management personnel.  (Flinn Dec., ¶ 18.)  While making deliveries, Flinn was required to obtain CEVA's approval to have passengers ride in his vehicle, he was required to communicate with CEVA dispatchers about the status of deliveries, and he was required to document each delivery and pick-up soon after completed.  (Id., ¶¶ 20, 28.)  He would also be contacted by dispatchers with new pick-ups orders, and could be ordered to "remain on stand-by in a particular area in order to be available for a potential pick-up assignment."  (Id., ¶¶ 16, 20, 21.)  If Flinn refused to remain on stand-by, he feared being "punished."  (Id., ¶ 21.)  Flinn also was generally required to end his workday at CEVA's depot in order to return undelivered freight, and to drop-off

1  paperwork and any freight or C.O.D. monies he picked up.  (*Id.*, ¶¶ 15, 24.)  Given
2  these facts, the Court concludes the amount of control CEVA exercised over Flinn is
3  consistent with an employee-employer relationship.

4       Next, the Court evaluates the secondary factors.  The same two facts that the
5  court in <u>Air Couriers</u> relied upon in finding that the drivers were not engaged in a
6  separate profession or operating an independent business exist here.  First, Flinn was
7  not required to make a major investment in equipment or materials, but instead was
8  only required to have a truck and Class C driver's license.  (*Flinn Dec.*, ¶ 4.)  Second,
9  Flinn worked for EGL / CEVA for a significant period of time, 1998–2012.  (*Flinn Dec.*,
10  ¶¶ 2, 5, 16.)  In addition to these facts, Flinn was required to request time off in
11  advance, was required to attend safety meetings, and could be written up by CEVA for
12  failing to follow CEVA's requirements or for incidents with other co-workers.  (*Id.*, ¶¶
13  26–28, Ex. D.)  Moreover, although Flinn was purportedly allowed to work for other
14  delivery companies, it was not practical as a result of the large CEVA decals placed on
15  his vehicle.  (*Id.*, ¶ 25.)

16       Lastly, the evidence also establish that Flinn was performing an integral and
17  entirely essential aspect of CEVA's business.  CEVA dictated the appearance and
18  maintenance of his vehicle.  Specifically, CEVA required the truck to be painted white,
19  kept clean and free of any damage, and routinely inspected by a mechanic.  (*Flinn*, ¶
20  13.)  CEVA's decals were to be prominently displayed on the truck, and Flinn was
21  required to wear a CEVA uniform while making deliveries.  (*Id.*, ¶ 12, 13, 14, 27, Ex.
22  B, Ex. C.)  The fact that Flinn received his assignments from CEVA's dispatchers
23  demonstrates that his deliveries and pick ups were to CEVA's clients, not his own.  (*Id.*,
24  15, 16, 20, 21.)  Furthermore, the requirement that Flinn remain in communication
25  with CEVA's dispatchers while making deliveries, and that he document each delivery
26  and pick-up on CEVA's computer-based EMAD system and shipping documents also
27  support the finding that he performed an integral and essential aspect of CEVA's
28  business.  (*Id.*, ¶¶ 16, 20, 21.)

1    Significantly, aside from objecting to various portions of Flinn's declaration,

2  CEVA's primary basis for urging that Flinn is not an employee is the Agreement's

3  designation of him as an independent contractor, and a few other provisions indicating

4  that drivers maintained discretion in performing certain aspects of their work.  (*Reply*,

5  8:10–11, 8:20–9:26.)  The Court is not persuaded for several reasons.

6    First, as indicated above, the "label placed by the parties on their relationship is

7  not dispositive[.]" <u>Brown</u> 32 Cal. App. 4th at 425.  Instead, <u>Air Couriers</u> demonstrates

8  that courts look the parties' actual conduct in determining the worker's status.  Here,

9  in contrast to Flinn, CEVA has offered no evidence indicating that the Agreement's

10  terms reflect the parties' actual conduct.

11    Second, Flinn's declaration explains why at least some of the discretion drivers

12  were purportedly afforded in the Agreement was illusory.  For example, though the

13  Agreement allowed Flinn to drive for other companies, CEVA's requirements that the

14  truck display its logos effectively prevented Flinn from doing so.  Similarly, while CEVA

15  contends that drivers were not required to accept assignments, Flinn's declaration

16  demonstrates that he rarely refused assignments out of fear of retaliation.

17    Third, and perhaps most important, for the reasons discussed below, Flinn's

18  uncontradicted testimony establishes that CEVA refused to discuss or explain the terms

19  of the Agreement, and that other hallmarks of procedural unconscionability exist.

20  Accordingly, just as in <u>Air Courier</u>, the Court discounts the significance of the

21  Agreement's terms in evaluating whether Flinn was an employee.

22    For the reasons set forth above, the Court finds Flinn was an employee.  Because

23  CEVA concedes Flinn was engaged in interstate commerce, the FAA does not apply.

24

25    **B.    <u>CEVA's arbitration and choice-of-law provision are unconscionable.</u>**

26    Flinn contends that the arbitration and choice-of-law provision is unenforceable.

27  (*Opp.*, 9:22–24, 13:9–20–15.)  For the reasons discussed below, the Court agrees.  And

28

because the choice-of-law requirement is unenforceable, the Court evaluates the arbitration clause under California law.

### 1.   California's unconscionability law.

"Under California law, courts may refuse to enforce any contract found 'to have been unconscionable at the time it was made,' or may 'limit the application of any unconscionable clause.'" Concepcion, 131 S. Ct. at 1746 (2011) (quoting Cal. Civ. Code Ann. § 1670.5(a) (West 1985)).  "A finding of unconscionability requires 'a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.'" Id. (quoting Armendariz v. Foundation Health Pyschare Servs. Inc., 24 Cal. 4th 83, 114 (2000)).  Although both elements generally must be present, "they need not be present in the same degree.  Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves."  Armendariz, 24 Cal. 4th at 114 (internal quotations and citations omitted).  "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." Id.

Oppression and surprise in the contracting process are the governing principles for procedural unconscionability.  Pokorny v. Quixtar, Inc., 601 F.3d 987, 996 (9th Cir.2010).  "Oppression addresses the weaker party's absence of choice and unequal bargaining power that results in no real negotiation.  Surprise involves the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party."  Chavarria v. Ralphs Grocery Co., 733 F.3d 916, 922 (9th Cir. 2013) (internal citations and quotations omitted).  Oppression can be readily found when the "contract was one drafted by the stronger party" and when the weaker party is denied an "opportunity to negotiate."  Id.  Large corporations contracting with

individuals are seen to be in a position of superior bargaining power. See Pokorny, 601 F.3rd at 996 (finding that "a large corporation . . . occupied a superior bargaining position" when contracting with employees); see also Circuit City Store, Inc. v. Adams, 279 F.3rd 889, 893 (9th Cir. 2002) (stating that the corporation possessed "considerably more bargaining power than nearly all of its employees or applicants"). When "the employee is facing an employer with overwhelming bargaining power who drafted the contract and presented it to [the employee] on a take-it-or-leave-it basis, the clause is procedurally unconscionable." Chavarria, 733 F.3d at 923 (citation and internal quotations omitted).

Substantive unconscionability is concerned with "the one-sidedness or overly harsh effect of the contract term or clause." Samaniego v. Empire Today, LLC, 205 Cal. App. 4th 1138, 1147 (2012) (quoting Lhotka v. Geographic Expeditions, Inc., 181 Cal. App. 4th 816, 824–25 (2010)). The focus is on whether "the term is one-sided and will have an overly harsh effect on the disadvantaged party." Pokorny, 601 F.3d at 997. "In the context of an arbitration agreement, the agreement is unconscionable unless there is a modicum of bilaterality in the arbitration remedy. Although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope, . . . the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself." Quinonez v. Empire Today, LLC, 2013 WL 1174141 *9 (Cal. App. 1 Dist., 2013) (internal quotations and citations omitted). Substantive unconscionability can be found when "the [a]greement exempts from the arbitration requirements claims typically brought by employers . . . while restricting to arbitration any and all claims plaintiffs might bring." Samaniego, 205 Cal. App. 4th at 1147. Additionally, where a provision "undermine[s] statutory protections, courts have readily found unconscionability." Id. (citations omitted).

In Samaniego, workers sued a carpet installation company under the California Labor Code for allegedly misclassifying them as independent contractors. Plaintiffs were

1    required to sign a contract when initially hired, and later were required to sign another
2    form contract in order to continue working for defendant. The second agreement
3    included a choice-of-law provision and arbitration provision that defendants moved to
4    enforce after the lawsuit was filed. Plaintiffs opposed arguing that the provisions were
5    unenforceable. The trial court agreed and denied the motion.

6         The Court of Appeal affirmed and found procedural unconscionability because
7    defendant required plaintiffs to sign the agreement in order to keep their jobs, and
8    plaintiffs were given little to no time to review the document. Samaniego, 205 Cal.
9    App. 4th at 1145–1146. Additionally, the plaintiffs spoke little to no English, but were
10   only given English versions of the agreement. Id. Surprise was also present in that the
11   agreement consisted of "11 single-spaced pages of small-font print riddled with complex
12   legal terminology," and the arbitration provision was located in the 36th of 37 sections
13   in the agreement, was not flagged by individual headings and was not required to be
14   initialed by plaintiffs. Id. at 1147. According to the court, "[t]aken together, these
15   factors amply support the trial court's finding that the Agreement was procedurally
16   unconscionable." Id.

17        The court also found the arbitration agreement was substantively unconscionable
18   because it shortened the three or four-year limitations period to six months. Id. This
19   functioned as an unacceptable "vehicle for the waiver of statutory rights." Id.
20   Additionally, the court found unconscionable that "the [a]greement exempts from the
21   arbitration requirement claims typically brought by employers—namely, those seeking
22   declaratory and preliminary injunctive relief to protect [defendant's] proprietary
23   information and non-competition/non-solicitation provisions—while restricting to
24   arbitration any and all claims plaintiffs might bring." Id.

25

26        **2.    CEVA's arbitration agreement is unconscionable.**

27        Here, CEVA's Agreement is at least as dramatic an example of procedural and
28   substantive unconscionability. After working for EGL / CEVA for approximately 12

years, Flinn was presented with the Agreement and told to sign the document or be terminated. (*Flinn Dec.*, ¶ 7.) CEVA refused to answer Flinn's questions about the Agreement, and would not explain or discuss the document in any detail. (*Id.*) These facts establish, contrary to CEVA's contention, that the Agreement was a nonnegotiable, take-it-or-leave it contract.

Moreover, unlike the 11-page contract in <u>Samaniego</u>, CEVA's Arbitration and Governing Law clause was buried in the middle of a 51-page document with complicated language regarding the parties' rights and obligations. (*See Agree.*, § 6.06.) And unlike other provisions in the Agreement, there was nothing to draw Flinn's attention to the provision; none of the language within the arbitration and choice-of-law provision was underlined or in bold, and Flinn was not asked to sign or initial the provision. (*See Agree.*, § 6.06; *compare e.g.* §§ 1, 2.08, 2.15, 3.03, 7.11.) These facts strongly support a finding that Flinn was surprised by the arbitration (and choice of law) requirement. <u>See also</u> <u>Gutierrez v. Autowest, Inc.</u>, 114 Cal. App. 4th 77, 89 (2003) (finding an arbitration clause unconscionable that was printed in eight-point typeface on the opposite side of the signature page and the buyer was not told the lease contained an arbitration clause nor were they required to initial it); <u>Quinonez</u>, 2013 WL 1174141 at *7 (finding procedural unconscionability where the arbitration clause was "on the last two pages of a densely worded, single-spaced contract printed in small typeface . . . not set out in a separate section or flagged with a heading").

CEVA nevertheless argues that the Agreement was not a take-it-or-leave-it agreement because "Plaintiff is a business owner, who had numerous options on the vendees he did business with." (*Reply*, 5:21.) But giving Flinn the only option of signing the Agreement without the ability to negotiate any of its terms after working exclusively for EGL/CEVA for 12 years is quintessentially take it or leave it. Moreover, under California law, the existence of numerous options does not preclude a finding of procedural unconscionability. <u>Pokorny</u>, 601 F.3d at 997 ("[t]he availability of alternative business opportunities does not preclude a finding of procedural

unconscionability under California law"); <u>Nagrampa v. MailCoups, Inc.</u>, 469 F.3d 1257, 1283 (9th Cir. 2006).[5]

Also similar to <u>Samaniego</u>, CEVA's Arbitration and Governing Law provision exempts the type of claims CEVA would typically pursue in the form of equitable relief for confidentiality and noncompetition claims, while requiring Flinn to arbitrate all of his claims. (*See Agree.*, § 6.06.)   Furthermore, the provision effectively shortens the statute of limitations by demanding that "[a] condition precedent to [Flinn's] right to bring a claim is that the [Flinn] give notice to Company, in writing, no later than 90 days after the claim accrues.  The notice must specifically state the complained of acts or omissions, the individuals involved, the dates and the damages claimed." (*Id.*, § 6.06(e).)  In other words, the provision requires Flinn to provide CEVA with a copy of the complaint for violation of the Labor Code within ninety days after the claim accrues.  This is a far cry from the three to four years the California legislature has provided in the Labor Code.  <u>Samaniego</u>, 205 Cal. App. 4th at 1147.  Nor is there a corresponding obligation for CEVA to provide pre-litigation notice to Flinn, and therefore no shortening of the statute of limitations applicable to CEVA's claims.  For these reasons, the Court finds CEVA's Arbitration and Governing Law provision unconscionable.[6]

_____

[5] CEVA's reliance on <u>Madden v. Kaiser Found. Hosp.</u>,17 Cal. 3d 699 (1976), is also misplaced.  Although <u>Madden</u> recognizes that "one who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument," the court goes on to point out that adhesion contracts are treated differently in this regard.  <u>Id.</u> at 710.  And the court did not find procedural unconscionability because the contract at issue was "a negotiated contract which neither limit[ed] the liability of the stronger party nor [bore] oppressively upon the weaker."  <u>Id.</u> at 712.

[6] CEVA also appears to argue that California's unconscionability doctrine creates rules specific to arbitration agreements involving employee statutory rights and thus is contrary to <u>Concepcion</u>.  The argument lacks merit for several reasons.  First, as found above, the FAA does not apply and thus <u>Concepcion</u> is not implicated.  Second, even if the Agreement was governed by the FAA, CEVA fails to identify the rules that are contrary to <u>Concepcion</u>.  Third, to the extent CEVA is attacking California's requirement of bilateralism, the requirement arises from the substantive unconscionability prong, which "focuses on the one-sidedness or

1        **3.      CEVA's choice-of-law provision is unenforceable.**

2        Under California law, "the weaker party to an adhesion contract may seek to

3   avoid enforcement of a choice-of-law provision therein by establishing that 'substantial

4   injustice' would result from its enforcement [citations omitted] or that superior power

5   was unfairly used in imposing the contract." Washington Mutual Bank, FA v. Superior

6   Court, 24 Cal. 4th 906, 918 (2001).  Thus, a "choice-of-law provision, like any other

7   contractual provision, will not be given effect if the consent of one of the parties to its

8   inclusion in the contract was obtained by improper means . . . ." Samaniego, 205 Cal.

9   App. 4th at 1148.  Additionally, whether the choice-of-law provision is enforceable

10  "will be determined by the forum in accordance with its own legal principles . . . ." Id.

11  For three separate reasons, the Court finds CEVA's choice-of-law requirement

12  unenforceable.

13       First, CEVA's choice of law is included in the same provision ("Arbitration and

14  Governing Law") as the arbitration requirement.  CEVA has not requested or argued

15  that the choice-of-law requirement should be severed from that provision.  Because this

16  Court has determined that the provision containing the arbitration requirement is

17  unconscionable, so too is the choice-of-law requirement contained within the same

18  provision.

19       Second, Samaniego is substantially similar to this case and, therefore, governs the

20  evaluation of the choice-of-law provision.  There, the Court of Appeal held that "the

21  same factors that render the arbitration provision unconscionable warrant the

22  application of California law." Id. at 1149.  Thus, for the reasons discussed above, the

23  Court finds CEVA's Arbitration and Governing Law provision was obtained by

24

25  ———————————————

26  overly harsh effect of the contract term or clause." Samaniego, 205 Cal. App. 4th at 1146.
    That prong applies to all agreements.  Because the goal of the FAA is to place arbitration

27  agreements on the same footing as other contracts, and not to elevate them above all other
    contracts, the Court finds California's bilateralism requirement is not contrary to the FAA.

28  Fourth, even if the bilateralism requirement is contrary to the FAA, the Court finds there is
    sufficient procedural unconscionability to invalidate CEVA's arbitration provision.

1   'improper means' and, to the extent Texas law might require enforcement of its

2   arbitration clause, enforcing CEVA's choice-of-law provision would result in substantial

3   injustice. See Id. (holding that to the extent Illinois law might require enforcement of

4   the arbitration provision, "enforcing Empire's choice-of-law provision would result in

5   substantial injustice."); see also Quinonez, 2013 WL 1174141 *10 (same).

6         Third, the Court also finds that the choice-of-law clause is unconscionable under

7   California law.  As explained above, the evidence establishes that the provision was

8   buried in the middle of a 51-page document, containing complex provisions, with

9   nothing to alert Flinn to its existence.  The Agreement was also given to Flinn on a

10  take-it-or-leave-it basis because his only option was to sign the document or be

11  terminated after working for EGL / CEVA for 12 years.  Under these circumstances, a

12  significant amount of procedural unconscionability exists.

13        The evidence also demonstrates that the choice-of-law provision is overly harsh

14  and one sided under the circumstances of this case.  CEVA's provision not only seeks

15  to have Texas law govern the interpretation of the Agreement, but also any dispute

16  between Flinn and CEVA.  The effect of the provision would, therefore, eliminate all

17  of Flinn's California Labor Code protections.  While similarly broad choice-of-law

18  provisions have been enforced, those cases appear to involve situations where at least

19  some portion of the employee-plaitniff's work occurred outside of California, in the

20  state whose law is to govern the relationship. See e.g. Olinick v. BMG Entertainment,

21  138 Cal. App. 4th 1286, 1290–1291 (2006) (enforcing choice-of-law provision

22  designating New York law to govern contract that was subject of extensive negotiations

23  between plaintiff (an executive for defendant) and defendant, and where plaintiff

24  worked for defendant in New York for six years before moving to California); Martin

25  v. D-Wave Systems, Inc., 2009 WL 4572743 * 6 (N.D. Cal., 2009) (enforcing choice

26  of law clause applying Canadian law where the "employment relationship largely took

27  place in British Columbia").  In stark contrast to those cases, there is no evidence that

28  Flinn ever worked for EGL or CEVA outside of California, much less in Texas, nor is

there even a suggestion that Flinn's work as a driver ever required him to have contact with any CEVA employee in Texas.  These facts are sufficient to support a finding that the choice-of-law provision is also substantively unconscionable.

For all these reasons, the Court find CEVA's choice-of-law provision unenforceable.

III.   CONCLUSION & ORDER

For the reasons stated above, the Court **DENIES** Defendants CEVA's motion to compel arbitration [Doc. 4].

**IT IS SO ORDERED.**

DATE: August 25, 2014

Hon. Thomas J. Whelan
United States District Judge